Filed 1/28/15  P. v. Farnum CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D066353 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SWF027707) |
| DANNIE JOE FARNUM, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside, Albert J. Wojcik, Judge.  Affirmed.

Carl Fabian, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Angela M. Borzachillo and Peter Quon, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendant and appellant Dannie Joe Farnum guilty of second degree murder of Baby John Doe (Pen. Code,[1] § 187, subd. (a); count 1) and of inflicting injury on a child under eight years of age causing death (§ 273ab; count 2). The court sentenced Farnum to state prison for the indeterminate term of 25 years to life on count 2 and stayed, under section 654, subdivision (a), his sentence for the indeterminate term of 15 years to life on count 1.

On appeal, Farnum contends the prosecutor allegedly admitted during closing argument that witness Jane Doe (Doe), Farnum's daughter, was incompetent in November 2008 due to her age and, thus, her then statements to authorities—that she saw her dad shake the baby and hurt the baby's head because the baby would not stop crying—should have been excluded from evidence. Farnum further contends the September 2011 trial testimony of Doe also should have been excluded because the prosecutor, again in closing, allegedly disavowed that testimony by arguing Doe's birth mother allegedly influenced Doe. Without the November 2008 statements or the September 2011 trial testimony, Farnum contends the evidence remaining against him is legally insufficient to support his conviction.

Farnum alternatively contends the court erred both in admitting under Evidence Code section 1235 Doe's November 2008 statements and in failing to satisfy its threshold duty to ensure Doe was then competent when she made those statements. Finally, he contends reversal is required because the court erred by failing to instruct the jury sua

---

[1] Unless otherwise noted, all further statutory references are to the Penal Code.

sponte on (1) causation, (2) the lesser included offense of involuntary manslaughter, and (3) the corpus delicti rule. Affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

Delice Preston testified she gave birth to Baby John Doe (sometimes, Baby John or baby) in mid-March 2008. Baby John was healthy at birth. Baby John's father was Johnny, Preston's common law husband of 15 years. Preston and Johnny also had a son together, Ricky, and Preston had a daughter, Kelly, from another relationship. Johnny unexpectedly died in May 2008.

In or about August 2008, Preston and Farnum met and began dating. Preston often took Baby John when she visited Farnum. Over time, Preston grew to trust Farnum in helping to care for Baby John when they were together.

Preston testified she had no plans to marry Farnum and had begun to question their relationship because she believed Farnum was cheating on her and was taking advantage of her financially. Farnum had little money and often borrowed Preston's car for days at a time. Preston testified she continued in the relationship with Farnum because at that time she "needed somebody" both "emotionally" and "physically."

According to Preston, in late October 2008 Baby John developed a medical condition called "infantigo" that led to a rash on his face, arms and buttocks. Because of the rash, Baby John was fussy. Baby John was also fussy because he was constipated and

---

2    We view the evidence in the light most favorable to the judgment. (See *People v. Osband* (1996) 13 Cal.4th 622, 690.) Portions of the factual and procedural history related to certain of Farnum's contentions are discussed *post*.

3

teething.  Preston comforted Baby John by holding him, using a warm washcloth to clean the "crusty stuff" near his eyes and putting antibiotic cream on a sore near his ear.

Preston testified she was using marijuana and methamphetamine during this period of time.  The night before Baby John died, Preston and Farnum together used methamphetamine.  The following day, November 10, 2008, Preston got up about 6:00 a.m. and fed Baby John.  Farnum and his two children from another relationship—Doe, then aged four, and JoJo, his son, then aged two—had stayed over with Farnum at Preston's home.  After lunch, Preston gave Baby John a bottle and put him down for a nap.

Later that afternoon, Preston left Baby John in Farnum's care when she went to buy groceries for dinner after Farnum refused to go.  When she left, Baby John was a little fussy but according to Preston, was nonetheless fine, and Farnum was in the process of giving him a bottle and putting him down for another nap.  Before leaving, Preston gave Baby John pain medication for teething and some medication for "gas."

Preston recalled her car's clock read 4:22 p.m. when she left for the store, which was located less than five miles from her home.  She was at the store for about 20 to 25 minutes.  When she returned, Preston put the groceries away and then went into the bedroom where Farnum was watching television.  Farnum seemed slightly agitated.  Preston glanced over and saw Baby John in the crib on his stomach.  Baby John was covered by two blankets and appeared to be sleeping.

While cooking dinner, Preston heard Farnum yell from the bedroom that the baby was not breathing.  Preston ran to the bedroom and saw Farnum giving Baby John CPR.  Farnum laid Baby John on the bed, started massaging Baby's John chest, pinched the

4

baby's nose and started breathing into his mouth. Panicked, Preston asked Farnum what had happened. Farnum in response said nothing. Farnum dialed 911. Preston ran outside and began screaming for help from her step children, Chris Gonzalez and Johnny Gonzalez, who lived on the same property, a short distance away.

Johnny Gonzalez came to help out. When he saw Farnum giving Baby John CPR, Johnny pushed Farnum aside and began giving the baby CPR. Preston told Johnny to stop because she believed he was being too violent with the baby. Although inexperienced, Preston also tried to give the baby CPR. About 20 minutes after 911 had been called, emergency personnel arrived.

Cal Fire Paramedic Greg Murphy testified he responded to the 911 call involving Baby John. Because the area where Preston and Baby John were living was very rural, Murphy said it took a while to locate the home. When Murphy arrived about 5:30 p.m., a man later identified as Farnum came running outside to meet Murphy. The man was holding a baby, later identified as Baby John. The man was attempting to perform CPR while carrying the baby.

Murphy directed the man to take the baby back inside the home. Once inside, the man began asking Murphy a lot of questions. Murphy subsequently noted in his report that he found the man nervous, but not frantic, and found it odd the man was both "extremely inquisitive" regarding the baby and unwilling to leave the baby alone with paramedics.

Murphy examined the baby and found him lifeless. The baby's pupils were dilated and fixed, his core was semi-warm and his extremities were cold to the touch. The monitor showed the baby had no heartbeat.

5

On questioning, the man told Murphy that about 40 minutes before 911 had been called, he fed the baby and then laid the baby down to sleep. About 10 minutes later, the man checked on the baby and found the baby facedown, wrapped in blankets and not breathing. The man also told Murphy the baby had been teething and had conjunctivitis of the eye. Once inside the well-lit ambulance, Murphy testified that he saw periorbital bruising around the baby's right eye, which was indicative of head trauma.

Farnum drove Preston to the hospital where Baby John had been transported. On the way, Preston asked Farnum, "What happened? Why wasn't he [i.e., Baby John] breathing?" Farnum responded he did not know. Once at the hospital, Preston was informed that Baby John had died, possibility of "SIDS" (i.e., sudden infant death syndrome).

Farnum later told Preston he was fearful he would be blamed for Baby John's death because Farnum had been in the bedroom when the child stopped breathing. Farnum also told Preston the child's face was "in the mattress" when Farnum discovered the child not breathing.

A few days later, Preston and her daughter were in the car with Farnum when Preston's daughter brought up the issue of "shaking a baby." During that conversation, Farnum seemed surprised that a child could die from being shaken.

Preston testified that initially she believed Farnum's children may have harmed Baby John because Farnum told her "one of his kids had maybe hit [Baby John] or maybe pushed him or something." Specifically, Farnum told Preston "that there was a Mag flashlight, the big ones that the police carry. They [i.e., his children] were using it as a light saber and swinging it around and stuff. And one of them may have hit him [i.e.,

6

Baby John]."  However, Preston also testified that when she returned from buying groceries at the store, Farnum then had said nothing about Baby John being accidently hit by Farnum's children, including with a flashlight.

A few days after Baby John's death, the police contacted Preston and asked her to come to the station for an interview.  The police previously had interviewed Preston on the night Baby John died, but she testified she could not recall much of that interview because she was then "high."

Before the interview at the police station, Preston testified she was aware that Farnum's daughter, Doe, had already spoken to a social worker about Farnum harming Baby John.  At that time, Preston did not want to believe that Farnum was potentially responsible for the baby's death.  Preston told police during the interview at the station that she did not believe Farnum would hurt Baby John and that she never saw Farnum strike his own children.  At trial, Preston testified she was not then truthful because she wanted to protect Farnum.  In fact, Preston had seen Farnum "hit" and "flick" his own children.

After police discussed the results of Baby's John's autopsy with Preston, she recalled Farnum had told her that earlier on the day Baby John died, he saw the baby fall out the sliding glass door in Preston's home and bump his head.  Preston also recalled during the interview that Farnum also had told her that on the day Baby John died, Farnum saw the baby fall and hit his head on a toy while standing in his crib.

The autopsy showed Baby John died of "blunt force trauma to his head."  The police told Preston during the interview that Baby John's head trauma could not have

7

been caused from Baby John falling and hitting his head or from a blow by a two- or four-year-old child, such as Doe or JoJo, as Farnum theorized.

Detective Randall Wortman testified he was assigned to investigate the death of Baby John after the autopsy concluded the cause of death was blunt force trauma and was ruled a homicide. Detective Wortman contacted Preston and asked her to come down to the station. Before Detective Wortman told Preston the cause of death, he questioned Preston. During the questioning, Preston said that Farnum did not want to be blamed for the death even though it "looked bad" and Farnum was the "last one with the baby."[3] At the same time police were interviewing Preston, they were interviewing Farnum in a separate room of the station.

When asked how Baby John died, Preston initially told Detective Wortman the baby likely suffocated because Farnum had reported finding the baby face down on the mattress. Preston also told police during the interview, "No, he [i.e., Farnum] said or we said together that we found or he found the baby face[]down in his mat -- in his crib mattress." Detective Wortman noted that, when Preston made this statement during the interview, she was referring to "speaking with the paramedics and the initial law enforcement the night it happened."

Preston also told Detective Wortman, "He [i.e., Farnum] told me that if we talked to the cops or whatever that he most likely was going to be the one blamed for this. He didn't tell me what he did. He didn't tell me what had happened." Preston told the police

---

[3]     The record shows Preston testified she could not remember making this and other statements to police during the stationhouse interview.

that Farnum confided in her that he likely would be charged with manslaughter or murder as a result of the baby's death.

Detective Wortman was present when Detective Steven Fredericks asked Preston, "Okay. After you had an initial conversation with [Farnum] about how you guys were gonna get your stories straight so that he wouldn't get blamed, did you have any second guesses in your mind about that? Did you have any thoughts in your head that this is the wrong thing to do?" According to Detective Wortman, Preston said, "Yes." Preston also told the detectives that Farnum had a "short fuse" with his children and that she saw Farnum "flick them on the forehead."

Initially, Preston told the detectives that she saw Baby John alive when she got back from buying groceries. However, as the interview continued, she changed her story and said that she put the groceries away and began making dinner after she got home from the store. Preston told the detectives that Farnum had told her that, earlier on the day Baby John died, Farnum saw the baby fall and hit his head on the sliding glass door in Preston's home. Preston also disclosed that Farnum had said he saw Baby John that same day hit his head on a toy after falling inside the crib. Finally, Preston disclosed that Farnum reported he might have tripped over some steps when he took Baby John outside to meet the paramedics, and that is how the baby sustained the head trauma.

Detective Wortman testified Preston became "extremely visibly shaken up and upset" after they discussed the results of Baby John's autopsy. The detectives told Preston that Baby John's death was not accidental and that the baby died of blunt force head trauma.

Detective Wortman testified they next put Preston and Farnum in a room together and recorded their conversation, which was played for the jury. The transcript of their conversation shows Preston immediately confronted Farnum and asked what happened to Baby John, because, according to Preston, the pictures from the autopsy showed Baby John's brain covered in blood. Preston told Farnum the police theorized that Baby John died as a result of being shaken or being hit on the head with an object.

The record shows Farnum then denied any wrongdoing, stating the only time he touched the baby while Preston was at the store was to give the baby a bottle. Farnum also stated that he had not been in the room with Baby John when Preston was at the store and that when Preston returned from the store, she went to the bedroom where the baby was sleeping and saw the baby was "okay." The record shows Preston did not agree that the baby was "okay" when she returned from the store, as Farnum suggested, and that she instead responded, "What happened?" The record also shows they discussed certain events that may have occurred earlier on the day Baby John died that led to his death, including, as noted, Farnum's report of seeing the baby fall back and hit his head on a toy; and Farnum's additional report that his son JoJo was playing with a Mag flashlight and swinging it around like a "light saber" shortly before the baby died.

With regard to the flashlight, Preston told Farnum his son must have been playing with it while she was at the store because she did not remember "anything about him [i.e., JoJo] having a flashlight." Preston also told Farnum she did not find a flashlight when picking up the bedroom. The record shows Preston repeatedly asked Farnum if his children were capable of hitting Baby John on the head with a flashlight that would lead to such trauma. Farnum responded, "Yes. And for me to say that about my children, it's

10

really hard and it really hurts, but yes." At another point, the record shows Farnum told Preston he was at the police station "because of" JoJo.

At some point during their discussion, the record shows Preston asked Farnum why his daughter Doe was saying Farnum was the one that killed Baby John. In response, Farnum said his children like to tell stories and "someone told [Doe] to say some of that shit." Farnum told Preston that when he asked Doe who told her to say he was responsible for the attack, Doe shrugged her shoulders and refused to identify the person or persons.

At the time of trial, Doe was six years 11 months old. Doe testified she saw the baby "got shooked" by "Dannie" (i.e., Farnum) because he "was mad." Doe also testified that the baby was seated in a stroller when the shaking occurred and that Dannie then dropped the baby "in the street." Doe further testified that her birth mother, Shannon Garcia, also told her that Dannie shook the baby and then dropped him in the street.[4]

Doe testified that she did not like talking about what happened to the baby and that, other than her birth mother, she had not spoken to anyone else about what had happened. When asked again, Doe testified that she could not remember if she had spoken to anyone else in the past about what had happened to the baby; that she remembered a "little bit"; and that she saw Dannie shake the baby and then drop him in the street. Doe testified Preston was inside her home and thus not present when Dannie

---

4    The record shows that sometime after Baby John's death, Doe and JoJo were removed from the care of their birth mother. At the time of trial, they were living in a new home with a prospective adoptive family.

11

shook and dropped the baby.  Doe said that her birth mother was with her when the incident occurred.

The record shows after Doe testified, the court granted the prosecution's motion to admit Doe's statements to Francisca Russo, a social worker with Riverside County Child Protective Services, made the day after Baby John's death.  Russo testified that she interviewed Doe at Doe's birth mother's house.  Also present during the interview was JoJo and Doe's maternal grandmother.

The first thing Doe told Russo during the interview was that the baby "was sad and stopped crying."  Doe also told Russo the baby was "sick" and when the baby died, "[her] dad was there and [her] brother was there."  Doe told Russo her brother was sleeping on the couch and Preston, who Doe then referred to as "Tink,"[5] was not home when the attack took place.

Russo testified that during the interview Doe repeatedly said, "The baby was crying; my dad was mad; my dad -- my dad hurt the baby."  Russo next asked Doe to use a "frog" (ostensibly a stuffed animal) to show how her dad hurt the baby.  Russo testified Doe took the frog and initially cradled it to provide comfort.  Doe next started making a "shaking motion" using the frog while saying the baby "would not stop crying, my dad was mad."  Doe told Russo that, "he hurt the baby, he put it on the bed hard" and that he "hurt his head."

---

5  Preston testified that Doe called her "Tink" because Preston had a tattoo of "Tinkerbell" on her right shoulder.  The record shows Russo appears to have misspoke when she subsequently referred to Preston as "Tiki."

Russo testified that during this initial interview, Doe did not mention the baby being dropped in the street or her birth mother being present during the shaking incident, as Doe had just testified. Russo testified she did not record the interview with Doe because that was not allowed.

Detective Kim Judge of the Riverside Sheriff's Department testified that based on Russo's interview with Doe, a Riverside County Child Assessment Team (RCAT) conducted a video interview of Doe a day or two after her in-person interview with Russo. The RCAT interview was conducted by Denise Bowman and was played for the jury.

The record shows in that interview, Doe recalled speaking to Russo and in response to Bowman's question, "What did you [i.e., Doe] tell her [i.e., Russo]," Doe said, "I told her ah, ah, my dad shaked the baby and, and grabbed his feet and hurt him on his head." Doe reiterated she saw her dad shake and hurt the baby after Preston had left. When Bowman again asked Doe who did this to "your brother," Doe quickly corrected Bowman, telling her, "Not my brother," and reiterated several times that her father shook the baby and that the baby lived with "Tink."

Doe then used a doll to show Bowman what Farnum had done to the baby. Doe told Bowman that her dad was hitting the baby's head on "his crib." Doe said she saw her dad shaking and hurting the baby in "Tink's" room, where the crib was located. Doe also told Bowman that her dad used his hand to hit the baby on the "butt." In response to Bowman's question, "[W]hen he [i.e., Farnum] was done hurting him [the baby], what did he do with [the baby]? Where did he put him?" Doe said, "In, back in his crib."

13

Bowman next asked Doe where her "daddy" went afterwards. Doe said, "He didn't go in jail." When asked if she spoke to her mother (i.e., birth mother) about what had happened to the baby, Doe said she had and that her mother had said, "Bad baby, bad baby!" Doe then told Bowman that her mother did not take the baby away and before Bowman could finish asking her next question, Doe added, "Only the Cops," ostensibly in response to the question who took the baby away.

Pathologist Aaron Gleckman testified as an expert on behalf of the People. He opined there was no evidence Baby John suffocated on his own. Dr. Gleckman found Baby John's upper frenulum, which he described as the connection between the lip and upper jaw, torn. He noted that injury was not "fresh" and was likely caused by past abuse, either by a "hard slap or a punch to the face."

Dr. Gleckman found a half-inch by quarter-inch red abrasion on Baby John's left temple. Dr. Gleckman described the abrasion as a "circular-shaped area of redness" and opined it was likely caused by "blunt trauma from some sort of object that had that sort of [a] circular shape." Because the injury showed no signs of healing, Dr. Gleckman opined the injury was of recent origin.

Dr. Gleckman testified there was a "large . . . light purple/pinkish" bruise or a contusion to the back of Baby John's head that appeared to be "fresh" given its color. On further examination, Dr. Gleckman found a large area of redness and areas of purple under the inner surface of Baby John's scalp, which Dr. Gleckman referred to as "subgaleal hemorrhage" caused by trauma. Dr. Gleckman opined this injury was large and was the result of "fresh bleeding."

14

Dr. Gleckman next examined the area below the skull bone. Dr. Gleckman found not only areas of redness but also a "crack" in Baby John's skull. Dr. Gleckman testified that the skull crack or fracture was "extensive" and that it was "actually harder to break an infant's skull than an adult's skull because as people get older their bones get more brittle." In contrast, according to Dr. Gleckman an infant's skull "is pliable; they're kind of elastic. So in this case it actually would take more force to fracture or break an infant's skull than an adult's."

Dr. Gleckman also found "massive" bleeding under the fibrous covering of Baby John's brain. In fact, Dr. Gleckman determined these purple areas took up about "half of the whole size of [Baby John's] brain." The bleeding was indicative of trauma "from either a hard impact to the head, or sometimes from very vigorous shaking of an infant." Dr. Gleckman could not definitely determine whether Baby John died from shaking, although he also could not rule it out as the cause of death. Given the size of the injury, the skull fracture and the amount of force Dr. Gleckman said would be necessary to cause Baby's John's extensive injuries, he opined Baby John died of "[a]busive head trauma" caused by an "intentional" act. Dr. Gleckman further opined that in light of the seriousness of Baby John's head injuries, the baby could have gone from being a "completely normal infant" to unconscious in a matter of seconds or minutes.

DISCUSSION

I

Sufficiency of the Evidence

A. *Judicial Admission*

1. *Additional Background*

The record shows in closing, the prosecutor relied on Doe's November 2008 statements both to Russo and Bowman in arguing Farnum was guilty of counts 1 and 2. The prosecutor highlighted Doe's statements that she saw her dad shake the baby and hurt him on his head; that "Tink" (i.e., Preston) was not present when her dad shook the baby; that her dad shook the baby and hurt the baby's head on the bed and/or crib because her dad got mad when the baby would not stop crying; and that after her dad hurt the baby, the baby was sad and stopped crying. The prosecutor argued to the jury that Doe made many of these statements *before* the autopsy was completed, confirming that Baby John died of "intentional abusive head trauma."

The record further shows that the defense during its closing aggressively attacked the credibility of Doe. The defense noted that in the 2008 interview with Bowman, Doe was asked, "So if I said you are a girl, is that a truth or a lie?" to which Doe responded, "Um, truth." Bowman, in a follow up question, asked Doe, "[I]f I said you're a boy, is that a truth or a lie?" to which Doe responded, "A truth." The defense noted that Doe was then only four years old; that during the interview with Bowman, Doe also said her birth mother and dad (i.e., Farnum) had both died; and that she referred to her younger brother, JoJo, then aged two, as being bigger than her. The defense contended Doe was not to be

16

believed, as she "says many things and then says maybe one thing that they [i.e., the People] all want to hear."

In rebuttal, the prosecutor addressed the defense's credibility attack of Doe: "And you know, oh, well, she didn't know the color of blue versus yellow [from the Bowman interview].[6] You know, she hadn't even been to school yet. *She didn't know the concepts between truth and a lie*. And the fact of the matter is, she doesn't even know the concept of death at this point in her life. But, you know, we're now asking her to come in here two years later and talk about what happened. And that's -- you know -- a good chunk of her life has gone by. She's moved on. She has a new name. She has a new family.

"She remembers that the baby died. She remembers that her father shook the baby. And you know what else she remembers? What her mom told her. That her mom told her that the baby was dropped outside. She was told by her mother -- and you saw in the RCAT interview -- that the baby was bad, it was a bad, bad baby, this woman who still to this day has contact with the defendant, her [i.e., Doe's birth] mother.

"And, you know, attacking her about little things like that -- what do you expect from a four-year-old girl? What do you expect from a six-year-old girl? But the heart of the matter is that she has no motive to lie. She doesn't even know what's going on in here, that her father's been charged with murder. That he killed this baby and he's never

---

6    The record is inconsistent on the issue of whether Doe knew her colors, as pretrial the People contended Doe had in fact correctly identified the colors shown to her during the RCAT interview, which the court appeared to confirm after watching the RCAT interview.

coming back. That by coming in here to testify -- what that means. She doesn't know any of that.

"And when she makes the statements that she makes to the CPS worker [i.e., Russo] and in the RCAT interview, it's at the time of the event, fresh in her mind. She knew exactly what happened before her mother had a chance to tell her that it was actually the baby was dropped outside, before, you know, she's moved on, before she's had a chance to forget and live with foster parents who are actively pushing her forward in life. It's at the time of the event when[] these things are fresh in her mind. And she described something that no child would have any concept of. Most adults don't even know about shaking a baby. But she did.

"And, so, yeah, *she may not know the difference between truth and a lie*. She may not know the difference between life and death. But she knew what she saw. And she knew that [Preston] wasn't there. And she knew that JoJo was sleeping. And she knew where it happened. And she knew why it happened -- because the baby wouldn't stop crying." (Italics added.)

     2. *Guiding Principles and Analysis*

Farnum initially attacks *indirectly* Doe's qualification as a witness by contending the above italicized statements, made in rebuttal by the prosecutor during closing argument, constitute a "judicial admission" that Doe was not competent in 2008. He thus further contends that without this evidence, there allegedly "is no remaining evidence of either an intentional nor [*sic*] a negligent act on the part of [Farnum] causing the death of the baby."

18

It is axiomatic that a prosecutor is free to give an opinion on the state of the evidence and has "wide latitude" to comment on its quality and the credibility of witnesses as long as it is a fair comment on the evidence and reasonable inferences or deductions therefrom. (*People v. Bonilla* (2007) 41 Cal.4th 313, 336–337; *People v. Martinez* (2010) 47 Cal.4th 911, 957 [noting a prosecutor is allowed a "'wide range of descriptive comment'" and his or her "'''argument may be vigorous as long as it amounts to fair comment on the evidence'''"].) Courts "accord counsel great latitude at argument to urge whatever conclusions counsel believes can properly be drawn from the evidence." (*People v. Cash* (2002) 28 Cal.4th 703, 732.)

"A judicial admission is a party's unequivocal concession of the truth of a matter, and removes the matter as an issue in the case." (*Gelfo v. Lockheed Martin Corp.* (2006) 140 Cal.App.4th 34, 48; *Barsegian v. Kessler & Kessler* (2013) 215 Cal.App.4th 446, 452 [noting a judicial admission is "ordinarily *a factual allegation by one party that is admitted by the opposing party*," with the result being the "allegation is removed from the issues . . . because the parties *agree* as to its truth"].) "'[A]n oral statement by counsel in the same action is a binding judicial admission if the statement was an unambiguous concession of a matter then at issue and was not made improvidently or unguardedly. [Citations.]'" (*Physicians Committee for Responsible Medicine v. KFC Corp.* (2014) 224 Cal.App.4th 166, 180, quoting with approval *Fassberg Construction Co. v. Housing Authority of City of Los Angeles* (2007) 152 Cal.App.4th 720, 752 (*Fassberg*); *Irwin v. Pacific Southwest Airlines* (1982) 133 Cal.App.3d 709, 714 [noting a counsel's statement may not be treated as a judicial admission if "it is made improvidently or

19

unguardedly, . . . is in any way ambiguous . . . [or] lacks the gravity of a complete relinquishment of rights on the issue"].)

Accordingly, "statements of counsel in argument are not deemed judicial admissions unless they have the formality of an admission or a stipulation."  (*People v. Kiney* (2007) 151 Cal.App.4th 807, 815, citing with approval *Coats v. General Motors Corp.* (1934) 3 Cal.App.2d 340, 350 [noting "[m]ere incidental or ambiguous statements by counsel" will not be binding or admissible "where there is no such formality in the making of the statements as to indicate an intention that they should be taken as admissions"]; *People v. Darden* (1927) 87 Cal.App. 181, 182-183 [rejecting contention of defendant that prosecutor's statement when original criminal complaint was filed was a binding admission because that statement was "only so shown in a running argument and does not rise to the dignity of a specific admission"].)

Here, we conclude the prosecutor's statements during rebuttal argument that Doe may not have known the difference between the truth and a lie cannot be fairly construed as a formal, unambiguous and deliberate admission that Doe was not qualified as a witness either in 2008, when she made the statements to Russo and Bowman a few days after Baby John's death, or in 2011 when she testified at trial.

In fact, the record shows that when the prosecutor made these two statements, she was actually imploring the jury to believe Doe's testimony.  In context, the record supports the conclusion that when the prosecutor made these statements, it was in response to the defense's contention that Doe was not to be believed as a witness after Doe said it was a "truth" that she was a boy in response to a question posed by Bowman during the RCAT interview.  Far from an unequivocal concession that Doe was not

20

competent as a witness, the record supports the exact opposite conclusion: namely, that the prosecutor was attempting to persuade the jury that Doe was a competent witness and that her statements to Russo and Bowman—that she saw her dad shake the baby and hurt the baby's head, including hitting the baby on the bed/crib, after her dad got mad because the baby would not stop crying—were credible and truthful.

Farnum's reliance on *Fassberg*, *supra*, 152 Cal.App.4th 720 is unavailing. There, a project manager of defendant testified on direct examination that plaintiff was owed about $400,000 in credit for work performed, which finding was also confirmed by one of defendant's trial exhibits. During closing argument, counsel for defendant acknowledged that plaintiff was entitled to about $400,000 in credit. (*Id.* at pp. 750-751.) The jury, however, failed to include the $400,000 credit in calculating its verdict. (*Id.* at p. 751.)

In reversing on this issue, the *Fassberg* court concluded there was "no substantial conflict in the evidence" that defendant was entitled to a credit of about $400,000. (*Fassberg*, *supra*, 152 Cal.App.4th at p. 752.) The court based its conclusion on the testimony of defendant's witness, the trial exhibit and defense counsel's acknowledgement of this fact during closing. With respect to the acknowledgement, the court noted defense counsel's statement that plaintiff was entitled to a credit was "clear and deliberate" and was based on the response counsel elicited from defendant's own witness. (*Ibid.*)

Here, as we have already noted, there was no concession by the prosecutor, much less one that was "clear and deliberate," that Doe was incompetent at the time she made the November 2008 statements to Russo and Bowman regarding the cause of the baby's

21

death.  In addition, there also was no evidence proffered at trial establishing the fact allegedly conceded by the prosecutor (i.e., that Doe was incompetent), in contrast to the situation in *Fassberg* where counsel of defendant merely reiterated in closing the testimony of defendant's own witness that plaintiff was entitled to a credit.  We thus conclude *Fassberg* is factually and legally inapposite in the instant case.

B. *Disavowing 2011 Trial Testimony*

Farnum next contends the prosecutor effectively conceded during closing argument that Doe's 2011 testimony could not be considered because Doe was allegedly coached and/or improperly influenced by her birth mother.  Specifically, Farnum contends the prosecutor in rebuttal told the jury not to rely on Doe's September 2011 testimony because according to Farnum, that testimony "only" accused Farnum of dropping the baby and did not describe an intentionally inflicted injury as was charged in the case.

First, Farnum misstates the record when he contends that Doe's 2011 trial testimony only established that Farnum had dropped the baby.  The record instead shows Doe testified that "Dannie" "shooked" the baby because he was mad.  When asked in follow up questioning what she saw with her own eyes, Doe said, "I seen him [i.e., Farnum or Dannie] shook him [i.e., Baby John]."

Second, the record shows Doe testified her birth mother, who Doe referred to as her "old mom," told her that the baby was bad, as Doe had also noted in her November 2008 RCAT interview with Bowman.  The record shows the prosecutor during closing argued to the jury that the birth mother allegedly had attempted to influence Doe and alter her testimony by telling Doe the baby was bad; that the baby had been hurt after being

22

dropped in the street; that the birth mother and Farnum were then still in contact; and that the birth mother's alleged attempt to influence Doe had been *unsuccessful* because Doe also testified she saw "Dannie" "shooked" the baby because he was mad. Thus, the record shows the prosecutor, far from disavowing the trial testimony of Doe, actually relied on it to corroborate Doe's statements to Russo and Bowman in November 2008 in arguing Farnum was guilty of counts 1 and 2.

Third, we note that even *if* the prosecutor sought to disavow Doe's 2011 trial testimony, there was still sufficient evidence in the record to support Farnum's conviction on counts 1 and 2, and, thus, any error was harmless under any standard of review. (See *Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

Here, the record shows Doe made statements to Russo the day after Baby John died that were consistent with the statements she gave Bowman during the recorded RCAT interview, namely that when she, JoJo and her dad (i.e., Farnum) were alone in Preston's home with the baby, she saw her dad shake the baby and hurt the baby's head because her dad was angry when the baby would not stop crying. The record shows that Doe told Russo she saw her dad shake the baby and put the baby "on the bed hard," which Doe demonstrated for Russo using a stuffed animal (i.e., a frog). Doe recognized her dad had hurt the baby because she told Russo the baby was "sad" and "stopped crying" after the attack.

The record shows the next day Doe used a doll to demonstrate to Bowman what her dad had done to the baby. Doe told Bowman that Farnum was hitting the baby's head on "his crib." Doe said she saw Farnum shaking and hurting the baby in "Tink's" room,

23

where the crib was located. Doe also confirmed in her interview with Bowman that her dad hurt the baby after Preston had left.

We conclude this evidence, when considered in conjunction with the testimony of Dr. Gleckman, who opined Baby John suffered a skull fracture and died of abusive trauma to the head intentionally inflicted by an adult, is sufficient to support Farnum's convictions on counts 1 and 2.

That there was other evidence and argument in the record from which a jury could have reached a different result does not change our conclusion in this case. Indeed, the record shows Farnum aggressively argued during closing that *Preston* murdered Baby John because she was "overwhelmed" and was under the influence of methamphetamine, which the record shows she and Farnum had used the night before the baby died. Farnum also argued during closing that Preston allegedly admitted in a letter she wrote to Farnum while he was incarcerated that she was responsible for his incarceration and that Doe's statements in November 2008 and her trial testimony in September 2011 could not be believed given her responses to certain questions, which Farnum further argued undermined her credibility.

As the fact finder, the jury was entitled to accept one or more of these arguments proffered by Farnum and the evidence in support thereof. By the same logic, the jury also was entitled to reject these arguments and any such evidence, as turned out to be the case here. (See *People v. Smith* (2005) 37 Cal.4th 733, 739 [a court of review is bound to accept the factual and credibility determinations of the trier of fact]; see also *People v. Mejia* (2007) 155 Cal.App.4th 86, 93 [if substantial evidence exists to support a verdict, a

24

court of review must accord due deference to the trier of fact and not substitute its evaluation of the facts or of a witness's credibility for that of the fact finder].)

Farnum also contends his conviction must be overturned because Dr. Gleckman opined the skull fracture and substantial head trauma Baby John sustained could have been the result of "very vigorous shaking" *or* a "hard impact to the head." Because Doe testified at trial the baby was dropped onto the street and because, according to Farnum, Dr. Gleckman neither from a medical nor factual basis ruled out a fall as the cause of Baby John's death, Farnum contends Dr. Gleckman's testimony is insufficient to support his conviction.

Initially, we reject this contention because as noted *ante*, we conclude Dr. Gleckman's testimony that Doe died of nonaccidental trauma caused by either shaking or blunt force trauma corroborated the statements of Doe that she saw her dad shake the baby, as demonstrated by her use of both a stuffed animal and a doll, and then saw the baby's head being struck hard against the bed and/or crib. We also note Dr. Gleckman reached the conclusion Baby John died of intentional abusive blunt force trauma *before* he was made aware of any statements that the baby had been "shaken, slammed and hit."

Moreover, we reject this contention because other than Doe's testimony that "Dannie" dropped the baby in the street, there is no evidence in the record that the baby in fact suffered a "significantly high fall onto a very hard surface, meaning several feet *or higher*" (italics added), which Dr. Gleckman in his testimony noted could potentially cause an infant's skull to fracture.

Indeed, the record here shows that before Farnum's arrest, he was repeatedly asked by Preston what happened to Baby John. The record further shows Farnum came up with

25

several theories to suggest how the baby might have received blunt force head trauma, including hitting his head on the sliding glass door; falling in his crib and hitting his head on a toy; or hitting his head when Farnum ran outside with the baby, *after* the baby stopped breathing, to meet paramedics dispatched after the 911 call. Farnum also suggested to Preston that his then two-year-old son JoJo might have inflicted the injury while using a flashlight as a "light saber." At no point, however, did Farnum ever tell Preston or the authorities that he or anyone else had dropped Baby John on the street, or dropped the baby at all, much less from "several feet or higher."

Our conclusion on this issue is also buttressed by the defense's closing argument. The defense did not argue Farnum or anyone else accidently dropped Baby John, much less onto a street. Instead, it argued such statements by Doe showed she was unreliable as a witness. Moreover, during closing the defense argued Dr. Gleckman was lacking in credibility not because he failed to rule out a fall as the medical or factual cause of Baby John's death, as Farnum now contends for the first time on appeal, but because he rejected the defense's contention that a "Mag flashlight couldn't cause that kind of damage" suffered by Baby John.

As before, although Farnum disputes the factual basis on which Dr. Gleckman opined that Baby John died from a nonaccidental abusive head injury caused by an adult, that factual basis was presented to the jury for determination. That the jury ultimately rejected Farnum's multiple theories regarding how Baby John died and accepted the theory presented by the People, as supported by Dr. Gleckman, does not afford Farnum the relief he now seeks. (See *People v. Smith*, *supra*, 37 Cal.4th at p. 739; *People v. Mejia*, *supra*, 155 Cal.App.4th at p. 93.)

26

C. *Evidence Code section 1235*

Farnum alternatively contends the court abused its discretion and erred in admitting under Evidence Code section 1235 Doe's November 2008 statements because Doe allegedly testified at the September 2011 trial she could not remember making these statements, and, therefore, her trial testimony allegedly was not "inconsistent" for purposes of this statute.

1. *Additional Background*

The record shows the court, in response to Farnum's motion in limine, held an Evidence Code section 402 hearing outside the presence of the jury to determine whether Doe was competent to testify at trial. It further shows the court extensively questioned Doe and, as a result, concluded she was "sharp" and competent to testify. Farnum does not dispute this finding on appeal.

At trial, as noted Doe testified she saw "Dannie" "shooked" the baby, which testimony was consistent with her November 2008 statements to Russo and Bowman. However, Doe also testified, as noted, that her birth mother told her Dannie dropped the baby in the street and that she saw Dannie drop the baby in the street.

At the conclusion of Doe's testimony, as noted *ante*, the prosecutor sought to admit under Evidence Code section 1235 Doe's November 2008 statements to Russo and Bowman, arguing such statements were inconsistent with her trial testimony. The record further shows the court reviewed the RCAT video and found that the video was admissible under Evidence Code section 1235. In reaching its decision, the court found that Bowman did not ask unduly suggestive questions; that Doe appeared to understand the questions asked of her and gave appropriate responses, including, by way of example

27

only, answering questions about when she would start school, the name of her upcoming teacher, where her dad lived and the fact that her dad had a girlfriend named "Tink." In addition, the record shows the court was impressed by the fact that Doe quickly corrected Bowman when Bowman mistakenly stated that her brother JoJo, as opposed to the baby, had been the one who died.

The court recognized Doe at times appeared "a little bit" confused by some of the questions posed by the interviewer. The court, however, earlier recognized that when "talking to somebody quite young," such as Doe, "it's more difficult for them to explain concepts. What is the truth? What is a lie? Than it is to talk about what they observed." Thus, although Doe "had some difficulty maybe with the definition of lie, truth – truth and the like," the court nonetheless concluded based on the totality of the circumstances that, in November 2008, Doe was consistent in describing what happened to the baby; Doe had "no motive whatsoever to fabricate"; and her statements appeared "trustworthy" and demonstrated an "indicia of reliability." As such, the court ruled the RCAT videotape was admissible as a prior inconsistent statement. It also ruled the probative value of admitting the videotape into evidence was not substantially outweighed by the probability that it would prejudice the jury against Farnum or create any substantial danger of confusing the jury or of confusing the issues.

2. *Forfeiture*

The record shows Farnum did not object to the admission of the RCAT video and/or the testimony of Russo on the basis that Doe's trial testimony was not inconsistent with her November 2008 statements. Instead, the record shows Farnum objected to the admission of this evidence on the ground that "there should be a requirement that there be

28

some corroboration, especially in children cases or children's statements, because of the very nature that they can be easily manipulated, children's statements, . . . as a safeguard against possible fabrication by very young witnesses."

"'It is, of course, "the general rule" . . . "that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal."'" (*People v. Waidla* (2000) 22 Cal.4th 690, 717; see *People v. Dorsey* (1974) 43 Cal.App.3d 953, 959 [rejecting defendant's contention that the admission of evidence concerning his bank account violated the best evidence rule because the only objection he made at trial was such evidence was inadmissible "because an insufficient foundation had been laid for the admission of the testimony under the business records exception to the hearsay rule" and therefore concluding defendant was precluded from complaining on review that the evidence violated the best evidence rule]; see also Evid. Code, § 353, subd. (a).)

The record shows Farnum did not give the trial court and the People the opportunity to consider or meet the evidentiary challenge he now raises, despite the fact the record specifically shows the court relied on Evidence Code section 1235 to admit the RCAT video and Doe's statements to Russo. His contention is therefore forfeited. (See *People v. Waidla*, *supra*, 22 Cal.4th at p. 717; see also *People v. McCoy* (2013) 215 Cal.App.4th 1510, 1524-1525 [noting the general rule that the failure to object to the admission of evidence on the basis of due process grounds must be raised in the first instance in the trial court or be deemed forfeited].)

3. *Guiding Principles and Analysis*

Even reaching the merits of his contention, however, we nonetheless conclude it is

lacking.[7]  "A statement by a witness that is inconsistent with his or her trial testimony is admissible to establish the truth of the matter asserted in the statement under the conditions set forth in Evidence Code sections 1235 and 770.  The 'fundamental requirement' of section 1235 is that the statement in fact be *inconsistent* with the witness's trial testimony.  [Citation.]  Normally, the testimony of a witness that he or she does not remember an event is not inconsistent with that witness's prior statement describing the event.  [Citation.]  However, courts do not apply this rule mechanically.  'Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness' prior statement [citation], and the same principle governs the case of the forgetful witness.' [Citation.]  When a witness's claim of lack of memory amounts to deliberate evasion, inconsistency is implied.  [Citation.]  As long as there is a reasonable basis in the record for concluding that the witness's 'I don't remember' statements are evasive and untruthful, admission of his or her prior statements is proper.  [Citation.]"[8]  (*People v. Johnson* (1992) 3 Cal.4th 1183, 1219-1220.)

---

[7]     In deciding the merits of this issue, we deem it unnecessary to address Farnum's alternate contention that he received ineffective assistance of counsel when the defense failed to specifically object to the admission of Doe's November 2008 statements on the basis they were not in fact inconsistent with her trial testimony for purposes of Evidence Code section 1235.

[8]     Evidence Code section 1235 provides: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his [or her] testimony at the hearing and is offered in compliance with Section 770. Evidence Code section 770 provides: "Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless: [¶] (a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or [¶] (b) The witness has not been excused from giving further testimony in the action."

Here, despite Farnum's contention otherwise, the record shows Doe's trial testimony was in fact inconsistent with several key statements Doe made in November 2008 to Russo and Bowman. At trial, Doe testified that "Dannie" shook the baby at *his* house. The record shows, however, that in November 2008 Doe told both Russo and Bowman that the shaking occurred inside Preston's or "Tink's" home. Similarly, at trial Doe testified her birth mother was standing right next to her when the shaking incident occurred. However, in her statements to both Russo and Bowman, Doe stated only she and her brother JoJo were present when her dad shook and hurt the baby.

What's more, at trial Doe testified Dannie picked up the baby from a stroller. In her earlier statements to Russo and Bowman, however, Doe made no mention of a stroller and instead said her dad was near a bed or crib when he picked up the baby, shook him and then hit the baby's head hard. In the RCAT video, Doe also told Bowman that after shaking the baby and hitting the baby's head on the crib, her dad put the baby back into the crib. At trial, however, Doe said after her father finished shaking the baby, he dropped him on the street.

Doe's trial testimony was also inconsistent because she told both Russo and Bowman that "Tink" was not home when her dad shook the baby, but at trial she testified "Tink" was inside her home. Doe's testimony was also inconsistent regarding JoJo: at trial on direct examination, Doe initially testified only she and her birth mother were present when Dannie shook the baby. On cross-examination, however, she stated that her brother JoJo was present when the shaking occurred, but that he was sleeping in a crib. However, the record shows when Russo interviewed Doe in November 2008, Doe specifically said that JoJo was sleeping on the couch when her dad shook the baby.

31

Finally, there was also inconsistency between Doe's trial testimony and her November 2008 statements regarding speaking to others about the shaking incident: as noted, at trial Doe testified she did not speak to anyone (other than perhaps her birth mother) about Dannie shaking the baby. However, the record shows Doe in fact did speak to both Russo and Bowman about the incident.

Thus, our examination of the record shows a reasonable basis for a belief that the testimony Doe gave at trial was in fact inconsistent in several key respects with the statements she gave Russo and Bowman in November 2008. We thus conclude the trial court properly exercised its discretion when it admitted the November 2008 statements by Doe. (See *People v. Geier* (2007) 41 Cal.4th 555, 586.)[9]

D. *Competency of Doe in November 2008*

Farnum next contends the court abused its discretion and thus erred when it admitted under Evidence Code section 1235 Doe's November 2008 statements without first determining whether she was competent in 2008. The record belies Farnum's contention.

Turning first to the RCAT video, as noted *ante* the court reviewed the video and found that Doe understood the questions asked of her and gave appropriate responses, even at times correcting the interviewer when the interviewer misstated facts. The court recognized that Doe at times struggled with certain questions or concepts, but, as noted *ante*, it also found that it was more difficult for someone as young as Doe to "explain

---

[9] In light of our conclusion, we deem it unnecessary to reach the People's alternate contention that Doe's claim of lack of memory at trial was tantamount to deliberate evasion, implying inconsistency for purposes of Evidence Code section 1235. (See *People v. Johnson*, *supra*, 3 Cal.4th at p. 1220.)

concepts" than to talk about what they "observed." The court found Doe was consistent in describing what she saw happen to the baby. The court also found Doe had no motive to fabricate.

There were other factors for the court to consider when it determined she was competent. Just a few days earlier, Doe had witnessed a tragic event: the death of a baby. While in the presence of her birth mother and grandmother, Doe initially described to Russo the shaking and hurting of the baby by *her* dad, which also was tragic. The next day, while still in the care of her birth mother, the record shows Doe again described in the recorded RCAT interview the shaking and the hurting of the baby in a manner that was very much consistent with the statements she had made to Russo a day earlier.

However, as noted, Doe also made statements during the RCAT interview that suggested she *may* have been influenced, including by the traumatic event itself. Doe told Bowman during the interview that her dad (i.e., Farnum) "died" and when asked "how," she responded, "Did yesterday." When asked who told her that her dad had died, Doe responded, "My mom." When asked if her mom told her someone else got hurt, Doe said, "My dad, my mom." Doe then went on to describe how her brother JoJo "jumped down and hurt hi[m]self and he got died" and also how she "got hurt" when she fell and scraped herself.

Moreover, the record shows during the RCAT interview Doe "was at times distracted, hoping to color and play." The record shows Doe nonetheless was able to describe what she saw with her own eyes and to demonstrate what she saw with a doll, thus showing an ability to recollect.

33

Although the court initially agreed with the prosecutor that admission of prior inconsistent statements under Evidence Code section 1235 allegedly did not require a showing of competency at the time those prior statements were made, the record shows the court nonetheless made what we conclude amounts to a competency finding after reviewing the video, noting: "So it appears to the court that there is an indicia of [Doe's] reliability, over and above the People's statement that we don't have to look at the competence issue . . . at the time of the interview."

We have independently reviewed the 23-page transcript of the RCAT interview and conclude there was no abuse of discretion, much less a showing of clear abuse (see *People v. Dennis* (1998) 17 Cal.4th 468, 525), when the court, after conducting an Evidence Code section 402 hearing and after listening to the child's trial testimony, found Doe was a reliable and qualified witness when she gave statements in November 2008. (See Evid. Code, § 701, subd. (a); see also *People v. Dennis*, *supra*, at p. 525 [noting the general rule that "'"every person, irrespective of age, is qualified to be a witness and no person is disqualified to testify to any matter"'"]; cf. *In re Basilio T.* (1992) 4 Cal.App.4th 155, 166 [noting the general rule that a court's determination concerning a witness's competency will not be reversed on appeal absent an abuse of discretion and further noting that when a witness in a dependency hearing is found *incompetent*, in contrast to the instant case, the witness's out-of-court-statement contained in a social worker's report is likewise inadmissible], superseded by statute as noted in *In re Lucero L.* (2000) 22 Cal.4th 1227, 1239-1242.)

That the record shows Doe at times struggled with certain questions during the RCAT interview, as pointed out by Farnum and as we have noted, does not, in our view,

change our conclusion in light of the record: once the court found Doe was competent and properly admitted the video, it was up to the jury to determine the weight, if any, to be given to it.

We further conclude, for the reasons already given, that the court properly exercised its discretion when it tacitly found Doe was also competent when she spoke in person to Russo the day *before* Doe's statements were recorded in the RCAT video; there is nothing in the record to suggest otherwise and no evidence Doe was any less competent one day before the court found her qualified as a witness.

Finally, the record belies Farnum's contention that, without Doe's statements, there allegedly was "no remaining evidence" of an intentional or negligent act on his part causing the death of the baby. The record here shows the jury was given the "consciousness of guilt" instruction (CALJIC No. 2.03), which provides: "If you find that before this trial [the] defendant made a willfully false or deliberately misleading statement concerning the crime[s] for which [he] is now being tried, you may consider that statement as a circumstance tending to prove a consciousness of guilt. However, that conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are for you to decide."

As noted *ante*, Farnum came up with several theories to explain how Baby John may have died while on *his* watch, including: suffocation from the crib mattress; falling; being hit on the head with a flashlight; being hit or pushed by Doe and/or JoJo; or being hit on the head when Farnum stumbled as he went outside to meet the paramedics. As also noted *ante*, when driving to the hospital Preston specifically asked Farnum what had happened to the baby to make him stop breathing. Farnum in response did not disclose

35

these or any other theories in response to Preston's question, but instead merely said he did not know. In addition, the record shows Farnum admitted it "looked bad" because he was the last one with the baby before the baby died. In light of the testimony of Dr. Gleckman regarding the cause of the baby's death, on this record we conclude that even without the evidence of Doe's November 2008 statements, the record contains substantial evidence to support Farnum's conviction on counts 1 and 2.

II

Jury Instructions

A. *Causation*

Farnum next contends the court erred when it failed sua sponte to instruct the jury with CALJIC Nos. 3.40[10] (Cause--"But-For" Test) and 8.55[11] (Homicide--Cause--Defined) in connection with count 2.

Briefly, the record shows that when discussing jury instructions for count 2, the court specifically inquired whether CALJIC No. 3.40 was required. The prosecutor stated the "but for" test in CALJIC No. 3.40 was not required, and the defense said

---

[10]    CALJIC No. 3.40 provides: "[To constitute the crime of there must be in addition to the (result of the crime) an unlawful [act] [or] [omission] which was a cause of that (result of the crime).]  [¶]  The criminal law has its own particular way of defining cause. A cause of the (result of the crime) is an [act] [or] [omission] that sets in motion a chain of events that produces as a direct, natural and probable consequence of the [act] [or] [omission] the (result of the crime) and without which the (result of the crime) would not occur."

[11]    CALJIC No. 8.55 provides: "To constitute [murder] [or] [manslaughter] there must be, in addition to the death of a human being, an unlawful act which was a cause of that death."

36

nothing. The court in response ruled, "Yeah, I didn't think so. I had it [i.e., CALJIC No. 3.40] there, but nobody wants that."

With respect to count 2, the court instructed the jury on the elements required to prove that charge (CALJIC No. 9.36.5)[12] and the elements required to prove an assault (CALJIC No. 9.00).[13] The court also instructed the jury that the person committing the assault had to have the present ability to commit the assault (CALJIC No. 9.01).[14]

---

[12] CALJIC No. 9.36.5 provides: "[Defendant is accused [in Count[s] ] of having violated § 273ab of the Penal Code, a crime.] [¶] Every person who, having the care or custody of a child who is under eight years of age, assaults the child by means of force that to a reasonable person would be likely to produce great bodily injury, resulting in the child's death, is guilty of a violation of Penal Code § 273ab, a crime. [¶] 'Great bodily injury' means significant or substantial bodily injury or damage; it does not mean trivial or insignificant injury or moderate harm. [¶] In order to prove this crime, each of the following elements must be proved: [¶] 1. A person had the care or custody of a child under eight years of age; [¶] 2. That person committed an assault upon the child; [¶] 3. The assault was committed by means of force that to a reasonable person would be likely to produce great bodily injury; and [¶] 4. The assault resulted in the death of the child."

[13] CALJIC No. 9.00 provides: "[Defendant is accused [in Count[s] ] of having violated section 240 of the Penal Code, a crime.] [¶] [Every person who commits an assault upon another person is guilty of a violation of Penal Code section 240, a [misdemeanor] [crime].] [¶] In order to prove an assault, each of the following elements must be proved: [¶] 1. A person willfully [and unlawfully] committed an act which by its nature would probably and directly result in the application of physical force on another person; [¶] 2. The person committing the act was aware of facts that would lead a reasonable person to realize that as a direct, natural and probable result of this act that physical force would be applied to another person; and [¶] 3. At the time the act was committed, the person committing the act had the present ability to apply physical force to the person of another. [¶] The word 'willfully' means that the person committing the act did so intentionally. However, an assault does not require an intent to cause injury to another person, or an actual awareness of the risk that injury might occur to another person. [¶] To constitute an assault, it is not necessary that any actual injury be inflicted. However, if an injury is inflicted it may be considered in connection with other evidence in determining whether an assault was committed [and, if so, the nature of the assault]. [¶] [A willful application of physical force upon the person of another is not unlawful when done in lawful [self-defense] [or] [defense of others]. The People have the burden

37

As noted *ante*, the defense *then* (as opposed to this appeal) did *not* dispute that the baby died of an intentionally-inflicted severe head injury, as testified to by Dr. Gleckman. Thus, the record shows the defense did not dispute that Baby John was assaulted and that the assault resulted in his death within the meaning of CALJIC No. 9.36.5. Rather, the issue for the jury to decide was *who* inflicted that injury for purposes of count 2. As also noted *ante*, the defense aggressively argued that Preston killed Baby John because she was overwhelmed and on drugs.

In light of this record, we conclude the court properly instructed the jury with CALJIC Nos. 9.36.5, 9.00 and 9.01, as these instructions required the jury to decide, consistent with Farnum's defense, whether Farnum or someone other than him (i.e., Preston) intentionally inflicted the head trauma on Baby John. As such, we conclude that even if Farnum did not forfeit this instructional error on appeal (see *People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249), his contention the court erred in failing to instruct sua sponte on causation lacks merit.

Finally, we reject this contention because the jury convicted Farnum in count 1 of second degree murder, a conviction that required a finding of an "unlawful killing of a human being with malice aforethought" (CALJIC Nos. 8.10 & 8.30). Because the jury

to prove that the application of physical force was not in lawful [self-defense] [defense of others]. If you have a reasonable doubt that the application of physical force was unlawful, you must find the defendant not guilty.]"

14     Finally, CALJIC No. 9.01 provides: "A necessary element of an assault is that the person committing the assault have the present ability to apply physical force to the person of another. This means that at the time of the act which by its nature would probably and directly result in the application of physical force upon the person of another, the perpetrator of the act must have the physical means to accomplish that result. If there is this ability, 'present ability' exists even if there is no injury."

clearly found Farnum was the person who inflicted or "caused" the baby's fatal head injury, the result would have been the same even if CALJIC Nos. 3.40 and 8.55 had been given. (See *People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088 [noting that in reviewing a challenge to jury instructions, a court of review must consider the instructions as a whole].)

B. *Lesser Included Offense of Involuntary Manslaughter*[15]

Farnum next contends that his conviction on counts 1 and 2 must be reversed because the trial court failed sua sponte[16] to instruct the jury that involuntary manslaughter was a lesser included offense of both counts. Specifically, he contends Doe's testimony that Farnum shook and then dropped the baby on the street was sufficient evidence to warrant such an instruction. We disagree.

For the court's sua sponte duty of instruction to arise, there must be evidence the defendant is guilty of the lesser offense that is substantial enough for consideration by the jury. (*People v. Barton* (1995) 12 Cal.4th 186, 195, fn. 4.) "'Substantial evidence' in this

---

15    Farnum raises this and the next issue by way of supplemental briefing. In explaining why he needed to file a supplemental brief, Farnum's appellate counsel explained these issues were "inadvertently omitted" from the opening brief. We note Farnum filed the request to submit a supplemental brief on August 30, 2013, after the People had filed their opening brief, and despite the fact Farnum's appellate counsel had been in possession of the record, as augmented, since September 20, 2012. We further note that Farnum does not appear to rely on any recently-decided authority in his supplemental brief, which would at least provide some explanation why he needed to brief these issues separately from his opening brief, which we note was also amended by his appellate counsel. We do not in any way condone the practice of a party filing multiple briefs under such circumstances.

16    The record shows at trial the defense expressly stated no lesser included instructions were being requested.

specific context is defined as evidence which is 'sufficient to "deserve consideration by the jury, i.e., 'evidence from which a jury composed of reasonable [people] could have concluded'" that the particular facts underlying the instruction did exist.' [Citations.]" (*People v. Burnham* (1986) 176 Cal.App.3d 1134, 1139–1140.)

Here, the record clearly shows the defense went to great lengths to discredit Doe's trial testimony, arguing she was a storyteller and not credible. This was in part based on her testimony that "Dannie" dropped the baby on the street, which led the court to admit after-the-fact her November 2008 statements under Evidence Code section 1235. Moreover, as we noted *ante*, there is no other evidence that Farnum or anyone else ever dropped the baby, much less onto a street. We thus conclude the court did not err in failing to instruct sua sponte the jury on involuntary manslaughter. (*People v. Barton*, *supra*, 12 Cal.4th at p. 195, fn. 4.)

We also reject this contention because as also noted *ante*, the defense's theory was that *Preston* killed Baby John because she was overwhelmed and on drugs. "'When a defense attorney makes a "conscious, deliberate tactical choice" to . . . forego a particular instruction, the invited error doctrine bars an argument on appeal that the instruction was . . . omitted in error.'" (*People v. McKinnon* (2011) 52 Cal.4th 610, 675.) For this separate and independent reason, we reject the contention the court erred when it failed to instruct the jury on the lesser included offense of involuntary manslaughter.

3. *Corpus Delicti*

Finally, Farnum contends the court erred when it failed to give sua sponte a corpus delicti jury instruction.[17] "In every criminal trial, the prosecution must prove the corpus delicti, or the body of the crime itself—i.e., the fact of injury, loss, or harm, and the existence of a criminal agency as its cause." (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1168–1169.)  The prosecution must establish the corpus delicti independent from the admissions of the defendant, thus assuring the accused does not admit to a crime which did not occur.  (*Id.* at p. 1169.)  "The independent proof may be circumstantial and need not be beyond a reasonable doubt, but is sufficient if it permits an inference of criminal conduct, even if a noncriminal explanation is also plausible.  [Citations.]  There is no requirement of independent evidence 'of every physical act constituting an element of an offense,' so long as there is some slight or prima facie showing of injury, loss, or harm by a criminal agency.  [Citation.]"  (*Id.* at p. 1171.)

Assuming without deciding the court had a duty to instruct sua sponte on the corpus delicti rule, we conclude that error was harmless: "Error in omitting a corpus delicti instruction is considered harmless, and thus no basis for reversal, if there appears no reasonable probability the jury would have reached a result more favorable to the defendant had the instruction been given.  [Citations.]"  (See *People v. Alvarez*, *supra*, 27

---

17     The corpus delicti rule is defined in CALCRIM No. 359 (and its predecessor, CALJIC No. 272) in part as follows: "The defendant may not be convicted of any crime based on (his/her) out-of-court statement[s] alone.  You may rely on the defendant's out-of-court statements to convict (him/her) only if you first conclude that other evidence shows that the charged crime [or a lesser included offense] was committed.  [¶]  That other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed."

Cal.4th at p. 1181.)  As long as there is "'a slight or prima facie showing'" permitting an inference of injury, loss, or harm from a criminal agency, the jury may consider the defendant's statements to strengthen the case on all issues.  (*Ibid.*)  "If, as a matter of law, this 'slight or prima facie' showing was made, a rational jury, properly instructed, could not have found otherwise, and the omission of an independent-proof instruction is necessarily harmless."  (*Ibid*; see *People v. Brucker* (1983) 148 Cal.App.3d 230, 237 [refusing to reverse conviction for failure to give a corpus delicti instruction because the "'omission, however, does not constitute reversible error if upon a reweighing of the evidence it does not appear reasonably probable that a result more favorable to defendant would have been reached in the absence of the error'"].)

As noted *ante*, in the instant case there was ample evidence separate and apart from Farnum's extrajudicial statements to support Farnum's conviction on counts 1 and 2, including the testimony of Dr. Gleckman and the November 2008 statements and trial testimony of Doe.  Accordingly, we conclude the failure to give this instruction was not reversible error.

## DISPOSITION

The judgment of conviction is affirmed.

BENKE, Acting P. J.

WE CONCUR:

NARES, J.

IRION, J.